The People of the State of New York, Plaintiff, *v.* Gordon Whitman, Defendant.

Court of General Sessions of County of New York, June 27, 1945.

*Gordon Whitman,* defendant in person.

*Frank S. Hogan, District Attorney (Bernard L. Alderman* of counsel), for plaintiff.

WALLACE, J. The defendant herein has been returned to this court — some thirteen years after his conviction and sentence in this court — on his motion to set aside his conviction and to vacate the sentence imposed on him.

The defendant was indicted on April 20, 1931, for the crime of manslaughter in its first degree, and was tried and convicted by a jury on December 15, 1931, of the crime of manslaughter in its first degree. The charge involved the shooting, late on the evening of March 9th, or early in the morning of March 10, 1931, of one Troy Cartrell in a rooming house at 130 West 66th Street, New York City. On December 22, 1931, the defendant was sentenced to State prison for a term of not less than five nor more than ten years for the manslaughter, and, in addition to that, for a term of not less than five nor more than ten years for the possession of a pistol, making a total sentence of not less than ten nor more than twenty years. From the time that the defendant started his sentence in State prison until the present time, a period of some thirteen years, the defendant has made repeated and frequent efforts to be relieved of the judgment of conviction, by appeals both to the judicial branch of government and to the executive.

He had originally filed a notice of appeal from his conviction, then abandoned his appeal, and it was thereafter dismissed. In early 1932, the defendant petitioned Governor Roosevelt for executive clemency, and in 1933 he renewed his petition before Governor Lehman, and after a thorough investigation the petition in each case was denied.

In the latter part of 1932, the defendant brought a motion in the Court of General Sessions for a new trial based on newly discovered evidence and his application was denied. In 1936, he applied in the Supreme Court of the State of New York for a writ of habeas corpus which was dismissed.

On March 29, 1939, the defendant was released on parole and permitted to return to his home in West Virginia. Several months later, however, he was convicted in that State of driving an automobile while under the influence of liquor, and, because of this conviction and his refusal to co-operate with the Federal parole officer, he was declared a delinquent on August 16, 1939, by the New York State Board of Parole, and ordered to return to State prison in New York to serve the balance of his term. The defendant refused to waive extradition, and after a hearing, the Governor of West Virginia granted extradition. The defendant tested the Governor's ruling through West Virginia's highest court which affirmed the order denying his application for a writ of habeas corpus. Thereafter, on April 29, 1940, Judge MARK L. JARRETT signed an order returning the defendant to New York, and, on May 2, 1940, he was returned to State prison in New York.

After his return to prison in 1940, the defendant sued out a writ of habeas corpus in the Supreme Court of this State, Washington County, and the writ was dismissed. The Appellate Division of the Supreme Court, Third Department, affirmed the lower court's determination (*sub nom. People ex rel. Whitman* v. *Wilson*, 263 App. Div. 908), and the Court of Appeals first denied permission to appeal when such leave was sought (287 N. Y. 856), and then, when it appeared that the defendant had filed a notice of appeal as of right, dismissed said appeal (290 N. Y. 670).

The Supreme Court of the United States thereafter heard the matter upon writ of certiorari and granted the petition. (*Sub nom. N. Y. ex rel. Whitman* v. *Wilson*, 317 U. S. 615.) Subsequently, the same court, citing the Court of Appeals' decision in *Matter of Lyons* v. *Goldstein* (290 N. Y. 19), remanded the case to the State court for its determination as to whether habeas corpus was an available remedy, or whether, in the light of the *Lyons* decision (*supra*), the exclusive remedy was by writ of error *coram nobis* (318 U. S. 688).

After the cause had been remanded, the respondent warden, Morhous, applied for an order prohibiting the State Supreme Court from adjudicating the issues in the habeas corpus proceeding, and, upon appeal to the Court of Appeals, it was decided

that habeas corpus was not available, that, under the circumstances disclosed, the defendant's only resort for relief was through the medium of a writ of error *coram nobis*. (*Matter of Morhous* v. *N. Y. Supreme Court,* 293 N. Y. 131.)

Following that decision, the defendant sued out such a writ in this court on August 24, 1944.

It is now the settled law in this State that it is not the Supreme Court of the State upon a writ of habeas corpus, but the court wherein a judgment of conviction was rendered which has jurisdiction to pass upon controverted questions of fact outside the record and determine whether the judgment was obtained by fraud or misrepresentation. Accordingly, upon this application, the defendant seeks to have the court rule that he was convicted without due process of law and by the court's and prosecutor's resort to illegal and fraudulent practices and devices.

The allegations upon which the defendant now relies are substantially the same as those which formed the basis for his petition for the writ of habeas corpus. In brief, the defendant asserts in his present petition: (1) that the district attorney knowingly used perjured testimony on the trial of the defendant; (2) that the district attorney deliberately suppressed evidence which, if introduced, would have aided the defendant; (3) that the district attorney, during the course of the trial, maliciously and fraudulently influenced the minds of the jury against the defendant by exhibiting to them newspaper clippings, which purported to relate the fact that the defendant had theretofore been convicted of killing a police officer in another State and that the district attorney gave these newspaper clippings to the foreman of the jury when the jury went out to deliberate, and (4) that the court and the district attorney were, throughout the trial, willfully engaged in a conspiracy to convict the defendant, as a result of which conspiracy the court did certain improper things to convince the jury of the defendant's guilt.

If those allegations were supported by fact, and were found to be true, there can be little doubt that the defendant would be entitled to relief and, indeed, the Court of Appeals so stated in the course of its opinion holding that habeas corpus was not the proper remedy (*Matter of Morhous* v. *N. Y. Supreme Court,* 293 N. Y. 131, 134, *supra*): " It is not now disputed that the allegations of the petition of the respondent Whitman upon his application for a writ of habeas corpus ' sufficiently charge a deprivation of rights guaranteed by the Federal Constitution,

and, *if proven,* would entitle petitioner to release from his present custody.' (*Pyle* v. *Kansas,* 317 U. S. 213,. 216.) '' (Italics mine.)

It was incumbent upon the court, therefore, to hear evidence and take proof as to the truthfulness of the charges relied upon by the defendant and set forth in his petition. If true, as already indicated, the demands of due process, as guaranteed by the Fourteenth Amendment of the Constitution of the United States, and section 6 of article I of the Constitution of New York State, would require that the relief be granted and that the judgment be set aside.

At the outset, and before considering the issues presented, I may say that a reading of the minutes of the defendant's trial persuades me that serious errors of law were committed by the trial court — errors that would have, in my opinion, warranted reversal of the conviction upon appeal, in spite of the fact that the defendant's guilt was clearly established. But the considerations upon appeal — which the defendant did not pursue — and the considerations upon an application such as the present for *coram nobis* are altogether different. In the latter case, the court of original jurisdiction which tried the case resulting in the judgment of conviction has the duty and the power to review the earlier proceedings, but its function is circumscribed. The court's inquiry is limited toward ascertaining whether the defendant, by the judgment of conviction, has been deprived of his liberty without due process of law. In other words, the judgment may be set aside on *coram nobis* '' where it appeared that the judgment complained of could not have been entered if the facts upon which the error is predicated had been presented in the trial court,'' or where it appeared that the judgment was '' obtained by fraud and misrepresentation.'' (*Matter of Morhous* v. *N. Y. Supreme Court,* 293 N. Y. 131, 136, 140, *supra.*)

An appeal is '' the appropriate corrective process for error at the trial and appearing in the record '' (see *Morhous* case, *supra,* p. 140), and, certainly, the Court of Appeals did not intend to enlarge the function of *coram nobis* and make it available as a substitute for an appeal. As a matter of fact, the courts of other States have definitely circumscribed the function of *coram nobis* in just such a way — as I am sure the appellate courts of this State would have it limited. (*United States* v. *Mayer,* 235 U. S. 55, 69; *Robinson* v. *Johnston,* 118 F. 2d 998, 1001; *Gross* v. *State,* 220 Ind. 37; *Sanders* v. *The State,* 85 Ind. 318.)

The charges which the defendant has made of fraud, subornation of perjury, and abuse of official power are both numerous and serious in character. More or less illustrative of some of the extravagant charges advanced are these two: (1) The Court of Appeals decided the case of *Matter of Lyons* v. *Goldstein* (290 N. Y. 19, *supra*) — which held that a court of criminal jurisdiction has inherent power to set aside, upon motion, its own judgment based upon fraud or misrepresentation of an officer of the State depriving a defendant of due process — solely for the purpose of preventing the Supreme Court of the United States from passing upon the defendant Whitman's own case and for the purpose of persuading that tribunal to remand it to the courts of this State; (2) that Mr. Justice BREWSTER was elevated from the trial bench to the Appellate Division solely for the purpose of preventing him from handing down any favorable decision on a habeas corpus application on Whitman's behalf — it appeared, I note, that Judge BREWSTER had previously held that the defendant's resort to habeas corpus was proper.

Such fantastic and irresponsible assertions, of course, supply their own answer. As to all of the charges made, though, I have made a thorough and painstaking inquiry, and, on the basis of court records, affidavits, and testimony — in short, on the basis of every available bit of relevant evidence and information — I reach the conclusion not only that the defendant has utterly failed to prove his allegations, but that he is a psychopathic personality and a pathological liar; that he was guilty of the crime of which he was convicted and that the proof bearing thereon, offered at the original trial, was clear and convincing.

As indicated, in considering the case and evaluating the evidence and the proof submitted, I considered, first, the transcript of the trial; second, the papers submitted by the defendant in support of his motion; third, testimony offered by the defendant in support of his charges; and, fourth, statements and testimony of any and all other witnesses presently available who could cast any light either upon the crime itself or upon the original trial.

As to the trial record itself, the original shorthand notes were kept pursuant to law for over five years, but have long since been destroyed. Three typewritten copies were transcribed at the time of the trial from the original shorthand notes by the original reporter, who, I note, still serves as a reporter in this court. The original transcribed copy has been

in the files of the court, and the first carbon copy has been in the possession of the reporter continuously since the time of the trial. Both the original and first carbon copy are in evidence on this hearing. The second carbon copy is and has been in the possession of the district attorney since the trial.

This trial record has been challenged by the defendant. He claims that it has been edited, distorted and deliberately changed by the stenographer under the influence of the original trial judge, or the district attorney, or both. He also asserts that it contained internal evidence of the fact that it was incorrect, and, to support that, he says that, although there is no testimony in the minutes upon the subject, the judge charged the jury that there were no powder burns on the deceased's clothing. The defendant contends that, while there was testimony *at the trial* to that effect, it was, for some reason, which he ascribes to malice, left out. While it is a fact that there is no oral testimony about powder marks, it does appear that the medical examiner had noted in his autopsy report that there were no powder marks on the deceased or on his clothing. The probabilities are, therefore, that the court had, in charging as it did, relied upon the contents of the autopsy report, for, I observe in passing, such reports are invariably produced in court in homicide cases.

The defendant also challenges the accuracy of the minutes introduced in evidence in a number of other respects.

He claims, for example, that on one occasion the trial judge said, "All these fellows from West Virginia like to shoot people," and on another occasion that, "I want no songs from you, Whitman." Neither of these statements appears in the official transcribed stenographic minutes of the trial, and the defendant alleges that these statements were purposely deleted from the record. At one time, he charged that these deletions were probably made at the direction of the trial judge. On another occasion, he claimed they were made by the official stenographer. On the hearing before this court, when confronted by the official stenographer, he said he did not want to charge him with improper conduct, and that he did not know how the deletions came about. All the witnesses called here on this hearing, including the trial jurors, the defendant's counsel and the witnesses who testified on his original trial, are unanimous in saying that they have no recollection whatever of the trial court having made either of the statements attributed to him by the defendant.

Again, he points to the testimony bearing upon whether or not he had been previously convicted of a crime as another instance of tampering with the trial record. It discloses that during the cross-examination of the defendant the assistant district attorney asked him whether he had ever shot a State trooper in the State of West Virginia. While the defendant acknowledges that such questions were asked, he contends that they were not originally contained in the stenographic minutes and have been added.

To support that, he called an attorney by the name of Joseph Wheless. He testified that sometime in 1932 or 1933, after the defendant's conviction, he read the record of the trial in the district attorney's office. He says that, to the best of his present belief and recollection, the questions in issue did not appear in the trial record. Mr. Wheless further testified that when he read the record his attention had not been directed to any particular point, and his purpose was to give his general opinion about the entire trial.

At the present time, this attorney is over seventy-six years of age, and testified that he had retired from the practice of law some four years. It is extremely unlikely that after reading the entire trial record, consisting of some 291 pages, that Mr. Wheless, or anyone else, could remember every question and answer, and, since his attention had not been directed to the specific questions now in issue, it is not at all unlikely that, though they were there, they made no impression upon him. At all events his testimony, constituting as it does negative proof, is of a very tenuous character. Insufficient to establish the fact that those questions were included when he read them, the evidence falls far short of establishing a subsequent tampering with the record.

In view of the many wild and extravagant statements made by the defendant, both in his various writings and in his testimony at this hearing, there can be little doubt — and I so find — that the trial record furnishes far more trustworthy evidence of what occurred on the trial than the defendant's recollection. No record of any trial purports to set down everything that occurs during the progress of the trial. It is a record of testimony from the witness stand, questions of counsel, answers of witnesses, rulings of the court, etc., all reported to the best of the ability of the court reporter present. It is not a report taken by a combination radio and moving picture apparatus, equipped to set down every movement in the courtroom, or every exclamation of everyone in it at all times. But it is a far

better basis on which to rely for information than the testimony of witnesses as to what happened many years before, particularly when the main witness against the record is a person most strongly moved by self-interest.

In any event, the court reporter testified on this hearing that the transcripts are correct, have never been edited, and that he never was instructed to edit them; and I am satisfied that he tells the truth. The judge and the assistant district attorney in the case are dead, and cannot defend themselves against these accusations.

In short, I find no support for the defendant's assertion that matter has been deleted from the record, or that it has been tampered with. Indeed, I am persuaded that the defendant has recklessly made his charges of record-tampering whenever he believed that such an attack would help his case.

The papers, letters and affidavits submitted on the motion constituted a further source to consider in passing upon the application. I will allude to this documentary evidence later; at the moment, I merely observe that, although the defendant has relied upon affidavits of several of the trial witnesses, he has not produced the originals of those affidavits, which would disclose signatures, but only copies of them.

And, third, I have, of course, considered the defendant himself, and the testimony he has offered. No one could see the defendant, listen to him and read his many statements, made over the past ten years, without coming to the conclusion that he is completely unreliable and not to be credited.

He has leveled accusations against everyone who happened to have been connected with this case, including the courts before whom he appeared, the prosecuting attorney and his own lawyers, most of whom had served him for practically nothing.

As an example, on this hearing one of his principal claims, and the one most easily susceptible of proof, was that the trial assistant district attorney handed to the foreman of the jury a newspaper clipping, not in evidence, which accused the defendant of having committed another crime in another jurisdiction, and that this newspaper clipping was taken out of the courtroom by the jury and considered by them before they arrived at a verdict. The trial record does not bear this out, and the foreman of the jury, and all the other jurors, as well as counsel for the defendant on that trial, testified that no such thing happened. When the foreman of that trial jury appeared on this hearing and testified that no such thing happened, the defendant blandly charged that the witness had not been the

foreman and that he could so swear. Later, when he became aware that the minutes of the clerk of the court indicated that the gentleman produced was the foreman of the jury, he altered his story: he had been dragged out of the courtroom so quickly at the conclusion of each session, he asserted, that he may have been mistaken as to the identity of the juror to whom the clipping had been handed. This is but one instance of the defendant's unreliability.

Finally, I had before me the testimony of actual witnesses — those to the crime, as well as those who, having been present at the trial, could report what had transpired there. Having in mind the fact that the defendant asserted that witnesses heretofore in this case had been intimidated or improperly influenced by persons in authority, I had all of the witnesses brought in to this hearing without any preliminary examination by anyone, so that they could be examined on the witness stand under oath in the first instance by the court itself.

Turning now to the allegations and considering them in order — the defendant maintains that perjured testimony was used against him on his trial: he points particularly to the testimony of the witnesses Harold Ames and Michael Ballant.

There were three witnesses produced on the trial who were at or about the scene of the crime at the time it was perpetrated. They were Ames, Michael Ballant and the latter's mother, Mary Ballant. They were all interviewed by the police on March 10th, early in the morning, and on March 11th they all made statements to Assistant District Attorney Marro of the Homicide Bureau; those statements are in evidence on this hearing. Michael Ballant testified to little of consequence, but the statements of Mary Ballant and Harold Ames inculpated the defendant. Two days later, on March 13th, they appeared before City Magistrate BROUGH, and, on being examined by Assistant District Attorney Max Wieder, both Harold Ames and Mary Ballant reiterated their statements inculpating the defendant, although Mary Ballant began at that time to modify her testimony. A month later, on April 15th, these witnesses testified before the Grand Jury, and Ames's testimony was fairly consistent with his prior statements, but Mary Ballant further weakened her testimony.

On the trial of the defendant on December 10, 1931, some nine months after the killing, all these witnesses again testified, and Mary Ballant at this time repudiated virtually everything she had said in her original statement, and did her best to avoid giving any testimony damaging to the defendant.

Her son Michael testified to nothing of any particular value, and Ames, with a few minor exceptions, testified consistently with all the prior statements. The claim of the defendant with regard to these witnesses is substantially as follows: He says that all the statements made implicating him were perjurious, and he also asserts that the district attorney who tried the case knew this to be the fact, and that, nevertheless, he persisted in endeavoring to get the witnesses, and in particular Mary Ballant, to testify on the witness stand at the trial to substantially what she had theretofore said in her prior statements.

The assistant district attorney did, on the trial, attempt to bring Mary Ballant back to her original statements by confronting her with what she had said in the district attorney's office, in the Magistrate's Court and before the Grand Jury. This he had a right and a duty to do. The witness Mary Ballant refused to be refreshed, and virtually repudiated her past statements. There is no evidence, except the assertions of the defendant, that the assistant district attorney believed that the original statements were false. On the contrary, it is clear that he did not. Mary Ballant, however, having declined to be refreshed by her prior statements, the court should have instructed the jury that her evidence was the testimony given on the trial, and not the statements made prior to the trial. In other words, the court should have instructed the jury that they must not substitute Mary Ballant's prior statements for the testimony given on the trial and regard it as her testimony on the trial. The failure of the court so to instruct the jury is an error that might have been asserted upon appeal, but the defendant has fallen far short of proving by evidence either in the record or " outside the record " that the district attorney either knowingly, or otherwise, used perjured testimony.

The defendant also claims that, because of the action of the judge in causing the arrest of Mary Ballant for perjury at the trial — and her subsequent prosecution — the witness Ames was coerced into repeating his previous statements inculpating the defendant — although, the defendant claims, they were false: in other words, Harold Ames was forced by the prosecution's tactics to give perjurious testimony.

This whole contention, of course, rests on the assumption that the original stories told by the witnesses Ames and Mary Ballant were false. It is my opinion, after a careful review of all the documents and records in this case, that the original

stories told by the witnesses Mary Ballant and Harold Ames were true, that Mary Ballant was guilty of perjury on the trial, was properly indicted therefor, and should have been convicted therefor and that the witness Ames was not coerced into giving false testimony against the defendant.

The defendant asserts that the manner of the judge in questioning Mary Ballant on the witness stand during the trial, and the manner in which (as he claims) she was taken into custody in the courtroom, brought to the attention of the jury the fact that the trial court thought that she was lying on the witness stand, and that that prejudiced the defendant with the jury. Just exactly what happened in the courtroom is a matter of dispute. While the defendant claims that Mary Ballant was dragged from the witness stand by a court attendant, the People assert that she was merely escorted to a seat in the courtroom as were other witnesses, that she remained seated there until after the jury left, and that it was only after their departure that she was arrested for perjury.

The record does not disclose any arrest of the witness in the presence of the jury, and most of the jurors do not support the defendant's story, having testified before me that there was no arrest in their presence. Indeed, only two of them say that they have some recollection that Mary Ballant was escorted from the witness stand; and of the two, one said he did not know the significance of the act, and the other said that it was his impression that Mary Ballant was being arrested for perjury. On cross-examination, however, this latter juror said he did not recall whether or not Mary Ballant was escorted from the witness stand by a court officer.

I conclude that Mary Ballant was not arrested in the jurors' presence, and, therefore, it is not necessary to determine whether such an error would have called for a reversal had it appeared in the record. Furthermore, assuming that such an error was committed, the defendant's remedy would have been to move on appeal for a correction of the trial record. Such an error, if established, is not within the purview of *coram nobis*.

The defendant claims in regard to the witness Ames that he has further evidence " outside the record " that Ames perjured himself on his trial. He asserts that after the trial Ames sent a letter to young Ballant, and that he also told Mary Ballant, Catherine Euschen, Mary Kastner, Cora Martin and John McCloskey that he believed the defendant Whitman to be innocent, but that he was afraid to tell the truth upon the trial. In order to get at the facts, I directed that all the persons named

who could be found should be called as witnesses. Ames, Mary Kastner and John McCloskey were dead, but Catherine Euschen, Cora Martin and Mary Ballant did testify before me.

Catherine Euschen denied ever having made an affidavit, as claimed by Whitman, and further denied Whitman's assertion that Ames had ever told her that he had testified falsely against the defendant. Cora Martin declared that, while she may have signed the affidavit attributed to her, the truth was that Ames had never told her that he had lied at the trial. Mary Ballant testified to the same effect.

The defendant also contends that the district attorney, in collusion with the trial court suppressed evidence which would have been helpful to him, in that Catherine Euschen and Hamil Dean were not permitted to testify on his trial. Samuel Lipski, the lawyer who represented the defendant on his trial, testified at this hearing that neither the district attorney nor the trial court prevented him from calling witnesses whom he desired to call. It was his testimony that he was unaware of the fact that Catherine Euschen or Hamil Dean could have given any evidence that would have helped the defendant. Catherine Euschen and Hamil Dean were witnesses on this hearing, and it developed from their testimony herein that, knowing nothing about the facts bearing upon the killing, they could not have testified to anything either materially helpful or harmful to the defendant. Catherine Euschen says that she appeared at the court house for the first several days of the defendant's trial, and finally was told by the district attorney that *he* did not intend to use her as a witness.

I find that no credible evidence supports the defendant's contention and that he has failed to prove that the district attorney either used any perjured testimony or suppressed any evidence.

In conclusion, finding that the defendant has utterly failed to prove his allegations that the judgment of conviction was obtained by fraud, or without due process of law, the court denies his motion to set aside his conviction and to vacate his sentence.

Likewise without merit is the defendant's further point that he was improperly sentenced to an additional term of five to ten years for being armed (*People* v. *Caruso,* 249 N. Y. 302; *People* v. *Krennan,* 264 N. Y. 108), and, accordingly, his motion to revoke that additional punishment is denied.

As bearing upon the *bona fides* of the defendant, I regard it as significant that, at the very outset of the proceedings, he

announced in a letter to the court that he was willing to abandon his motion to set aside his conviction if the court would simply reduce his sentence by striking out the extra five-to-ten-year term imposed upon him for carrying a gun. He went so far as to imply that, if this suggestion were not accepted by the court, he would have to go forward and call as witnesses "members of the Bar" and "bring out facts which were injurious to their reputations and would ruin their life's career." Needless to say, no such evidence was produced by the defendant. His every action and his every word stamp the defendant as one entirely devoid of conscience or of an awareness of the meaning of truth. He has neither scruples nor qualms about making charges, no matter how baseless and farfetched, and asserting any claim, no matter how lacking in merit, so long as he believes some court or some judge may be deceived and grant him the relief he seeks.